Argued and submitted November 17, 1995, reversed and remanded April 17, 1996

# Richard FREDERICKS;
## John Schaefers; and S & J Chevrolet,
*Respondents,*

*v.*

# UNIVERSAL UNDERWRITERS INSURANCE COMPANY,
*Appellant.*

## (C 930570CV; CA A86413)

915 P2d 472

John H. Holmes argued the cause for appellant. With him on the briefs were Martin W. Jaqua and Holmes & Rickles.

Christopher A. Rycewicz argued the cause for respondents. With him on the brief were Michael J. Knapp, Myers & Knapp and Stewart Sokol & Gray.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

In this declaratory judgment action, plaintiffs seek a declaration that defendant, their insurer, had an obligation to cover their expenses in defending certain lawsuits brought against them.[1] ORS 28.010 *et seq*. After the complaint was filed, plaintiffs moved for summary judgment. Defendant then filed a cross-motion for summary judgment on the ground that it has fulfilled its obligations under its policy by paying $20,000 of plaintiffs' defense expenses. The trial court ruled for plaintiffs on all of their claims, ORCP 47 C, and defendant appeals from the resulting judgment. We reverse.

Plaintiffs Richard Fredricks and John Schaefers own and operate S & J Chevrolet, an automobile dealership in Forest Grove. In January 1992, defendant issued its policy to plaintiffs, effective from January 1, 1992, through January 1, 1993. It provided a variety of coverages, including limited defense-cost coverage for certain types of claims. The policy provided for payment of defense costs, including attorneys fees, up to a limit of $10,000 for any claims for "product related damages" and up to $25,000 for costs incurred to defend any claim seeking "legal damages."

In July 1992, seven individuals filed a single lawsuit (the Dominguez action) against plaintiffs alleging six discrete and unrelated occurrences.[2] The complaint charged that plaintiffs had violated the Oregon Racketeer Influenced and Corrupt Organization Act, ORS 166.715 to ORS 166.735 (ORICO), the Oregon Unlawful Trade Practices Act, ORS 646.605 to ORS 646.652 (UTPA), and had also committed common law fraud. In October 1992, three more individuals filed another action against plaintiffs[3] (the Carnalla action) again alleging discrete and unrelated claims. That complaint also alleged that plaintiffs had violated ORICO and the

---

[1] Only the action against plaintiffs by the State of Oregon remains pending. According to the record, the other actions were ultimately settled.

[2] The six individual plaintiffs in that suit are Rafael Dominguez, Jesus Mercado, Donaciano Dominguez, Rufina Jaimes Hernandez, Guadalupe Cassillas, Eloisa Martinez and David Casarez. Casarez and Martinez are husband and wife.

[3] They are Carlos Carnalla, Fernando Hernadez Alvarez and Joann Tardio.

UTPA. Defendant has paid $10,000 per action under its policy for defense costs incurred by plaintiffs in the defense of the actions.

In March 1993, plaintiffs filed a motion in both actions contending that the claims in the actions were improperly joined. The trial court agreed with plaintiffs' argument but did not dismiss the actions. It ordered that the individual claims be severed and, also, that they would continue pending as if they initially had been filed as individual claims. The trial court also ordered that the new complaints when filed were to relate back *"nunc pro tunc"* to July 1992, the date that the Dominguez action was filed. As a consequence, no new actions were filed. The individual complaints were filed as amended complaints in the original actions. Additionally, the Oregon Attorney General filed an action in February 1993 seeking civil penalties, attorney fees, restitution and injunctions under the UTPA based on conduct that occurred between January 1, 1991, and February 24, 1993.

In this declaratory judgment action, plaintiffs seek coverage under the policy for all of the individual claims as well as for the action filed by the Attorney General. They argue that the complaints filed against them are subject to the "legal damages" provision of the policy and that, as a result, they are entitled to up to $25,000 in defense costs for each of the nine individual claims as well as for the action brought by the Attorney General. Defendant counters that it has fulfilled its obligation under the policy by the payments that it has already made.

■ ■ On appeal, defendant makes five assignments of error. It first assigns as error the trial court's ruling that the underlying actions fall within the "legal damages" coverage of the policy. We review the construction of the policy language as a matter of law. *Weathers v. M.C. Lininger & Sons*, 68 Or App 30, 33-34, 682 P2d 770, *rev den* 297 Or 492 (1984). The policy language provided in part:

> "WE will pay all defense costs actually incurred to defend any suit asking for * * * LEGAL DAMAGES when such insurance is included in your declarations. * * * Otherwise, all court costs, settlements and damages assessed against YOU will be at YOUR expense.

"* * * * *

"WE will pay all defense costs actually incurred to defend any suit asking for PRODUCT RELATED DAMAGES when such insurance is included in the declarations. * * * Otherwise, all court costs, settlements and damages assessed against YOU will be at YOUR expense."

The policy defines "legal damages" and the covered actions brought to recover "legal damages":

"LEGAL DAMAGES MEANS ANY SUIT FILED AGAINST YOU, OTHER THAN AS A RESULT OF AN OCCURRENCE OR AS DEFINED IN PRODUCT RELATED DAMAGES,

"(1) DURING THE COVERAGE PART PERIOD TO WHICH THIS ENDORSEMENT APPLIES, OR

"(2) AFTER THE COVERAGE PART PERIOD TO WHICH THIS ENDORSEMENT APPLIES IF YOUR ACTS GIVING RISE TO THE SUIT OCCURRED DURING THE COVERAGE PART PERIOD TO WHICH THIS ENDORSEMENT APPLIES AND NO COVERAGE IS AVAILABLE TO YOU UNDER ANY POLICY IN FORCE AT THE TIME SUIT IS FILED.

"SUCH SUITS MUST BE FILED:

"(A) BY OR ON BEHALF OF A CUSTOMER ARISING OUT OF GARAGE OPERATIONS BECAUSE OF AN ALLEGED VIOLATION OF *ANY FEDERAL, STATE OR LOCAL* ODOMETER, *TRUTH-IN-LENDING*, TRUTH-IN-LEASING, AUTO DAMAGE DISCLOSURE *LAW*, COMPETITIVE AUTO PARTS LAW OR FEDERAL USED CAR 'BUYER'S GUIDE' (REGULATION 455) AND SIMILAR LOCAL OR STATE REGULATIONS * * *.

"* * * * *

"'PRODUCT RELATED DAMAGES' means any suit filed against YOU during the Coverage Part period by or on behalf of a customer arising out of the sale, service or repair of YOUR PRODUCT, other than as a direct result of an OCCURRENCE or as defined in LEGAL DAMAGES." (Emphasis supplied.)

The policy also limits the amount that defendant is obligated to pay:

"THE MOST WE WILL PAY - Regardless of the number of INSUREDS or AUTOS insured by this COVERAGE Part, persons or organizations who sustain INJURY, claims or suits brought, the most WE will pay is:

"* * * * *

"2.   With respect to PRODUCT RELATED DAMAGES $10,000 in defense costs for any one suit asking for such damages * * *.

"* * * * *

"4.   WITH RESPECT TO LEGAL DAMAGES, $25,000 IN DEFENSE COSTS FOR ANY ONE SUIT ASKING FOR SUCH DAMAGES, BUT NOT FOR MORE THAN THE LIMIT SHOWN IN THE DECLARATIONS FOR THE AGGREGATE TOTAL OF ALL SUCH DEFENSE COSTS FOR ALL SUITS FILED DURING AND AFTER THE COVERAGE    PART    PERIOD    TO    WHICH    THIS ENDORSEMENT APPLIES."

Defendant argues that the underlying lawsuits seek only "product related damages" as defined in the policy because the complaints do not allege truth-in-lending violations as covered by the policy. Plaintiffs' counter-argument in essence consists of three parts: (1) that certain parts of the UTPA constitute truth-in-lending laws as contemplated by the policy; (2) that the underlying complaints filed against plaintiffs contain allegations that, if proven, could constitute violations of those provisions of the UTPA; (3) that, therefore, defendant has the obligation to pay up to the policy limits for "legal damages" coverage.

■    The governing rule of construction of an insurance contract is to ascertain the intention of the parties based on the terms and conditions of the policy. In carrying out that task, we consider first the meaning of the phrase in the light of the context in which the terms are used and the other provisions of the policy. A phrase in an insurance policy may have more than one plausible meaning. Our inquiry is whether a proposed interpretation continues to be reasonable after consideration of the particular context in which the phrase is used in the policy and the broader context of the policy as a whole. If after such an evaluation, two or more interpretations of the policy provisions remain plausible,

then we resort to rules of construction. *Hoffman Const. Co. v. Fred S. James & Co.*, 313 Or 464, 474, 836 P2d 703 (1992).

■ Here, the policy provides defense costs for an alleged violation of "ANY FEDERAL STATE OR LOCAL * * * TRUTH IN LENDING * * * LAW." "Any" means what it says. Nothing in the policy expressly restricts coverage to the federal act or its specific state or local counterparts. Rather, the policy's language suggests that it contemplates coverage for actions based on a variety of truth-in-lending laws. Even if it would be necessary to resort to rules of construction, any ambiguity is construed against defendant, the drafter of the language. *Hoffman*, 313 Or at 474. We conclude that, as used in this policy, the phrase provides coverage for an action that alleges facts that could be a violation of any law that has as its purpose the same objectives as the federal Truth-In-Lending Act (TILA) and its state and local counterparts.

We turn to the underlying complaints to determine if the complaints allege facts that give rise to a duty to pay defense costs because their allegations, if true, demonstrate violations of truth-in-lending laws. The underlying complaints allege that plaintiffs have violated ORS 646.608(1)(k) and 646.608(1)(s). Those provisions provide in part:

"(1) A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following:

"* * * * *

"(k) Makes false or misleading representations concerning credit availability or the nature of the transaction or obligation incurred.

"* * * * *

"(s) Makes false or misleading representations of fact concerning the offering price of, or the person's cost for real estate, goods or services."

We recognize that the UTPA is not the equivalent or counterpart of the TILA; nevertheless, the quoted UTPA provisions have the same objectives as those of the federal TILA. For instance, 15 USC § 1638, a part of the TILA provides:

"(a)  For each consumer credit transaction * * * the creditor shall disclose each of the following items * * *:

"* * * * *

"(2)(a)  The 'amount financed' * * *

"(3)  The 'finance charge' * * *

"(4)  The finance charge expressed as an 'annual percentage rate' * * *."

Under ORS 646.608(1)(k) and 646.608(1)(s), a misrepresentation about the amount financed is actionable because it is a representation about the credit available for the purchase of goods and reflects on the cost of goods. Thus, for purposes of the "legal damages" provision in the policy, the claims allege violations that fall within the definition of truth-in-lending laws, and the limits for that coverage are applicable to the defense costs for the underlying actions.

■ In its second assignment of error, defendant asserts that the trial court erred in ruling that policy limits apply separately to each of the nine separate actions that were filed after the policy expired. The trial court ruled that the new complaints filed in 1993 "related back" to the two actions filed in 1992 and entered its order of severance *nunc pro tunc.* The order had the effect of imposing separate limits for all nine claims. Defendant says that under the policy language, its limits are established by the number of lawsuits filed during the policy period, regardless of the number of persons who may claim injury in any one action.

The governing policy provision provides in part:

"THE MOST WE WILL PAY - Regardless of the number of * * * persons or organizations who sustain INJURY, claims made or suits brought, the most WE will pay is:

"* * * * *

"2.  With respect to PRODUCT RELATED DAMAGES * * * $10,000 in defense costs for any *one* suit asking for such damages * * *.

"* * * * *

"4.   WITH RESPECT TO LEGAL DAMAGES, $25,000 IN DEFENSE COSTS FOR ANY *ONE* SUIT ASKING FOR SUCH DAMAGES * * *." (Emphasis supplied.)

■      The policy language is clear. The limits are based on the number of lawsuits, not on the number of people who claim injury. Even though the subsequent nine actions were derivatives of the original lawsuits, those actions were not filed during the policy period. Only two "lawsuits" were commenced during the policy period. The trial court could not change that fact by a *"nunc pro tunc"* order, because nothing can be made *nunc pro tunc* unless it actually took place on the prior date. *Roeser v. Roeser*, 116 Or 108, 112, 239 P 541 (1925).

As to the court's "relation back" ruling, we turn to ORCP 23 C, which provides:

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against the party to be brought in by amendment, such party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining any defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party brought in by amendment."

Although the nine amended complaints may have related back to the initial filing dates for statute of limitations purposes, ORCP 23 C does not give the court the authority to rewrite the terms of the policy by expanding its limits of coverage. The procedural realignment of the claims in the underlying actions did not change the fact that only two lawsuits were filed within the policy period, which is the fact on which the policy limits are based. The trial court erred in ruling that the subsequently filed amended complaints related back to the actions filed within the policy period for

purposes of the policy limits.[4] Defendant's liability for defense costs regarding the individual actions is limited by the number of law suits filed in 1992.

■ In its third assignment of error, defendant argues that the trial court erred in ruling that the defense costs incurred in defending the action filed against plaintiffs by the Oregon Attorney General are covered by the policy. It makes two arguments that warrant a brief discussion. First, it argues that the action does not allege a violation of truth-in-lending laws. Second, it argues that the action is outside the coverage of the policy because "product related" coverage applies only to actions filed during the policy period and the Attorney General's action was filed in 1993.

The Attorney General's action contains allegations that plaintiffs violated the UTPA with regard to various credit terms and the amount financed. For the reasons previously discussed regarding the individual actions, those allegations are covered within the "legal damages" provision of the policy. Under the legal damages provision of the policy, defendant is obligated to provide defense costs if the "acts giving rise to the suit" occurred during the coverage period. The complaint alleged in part that:

> "Defendants misled consumers concerning the purchase price for automobiles sold to them by failing to disclose to them that additional items, which those consumers had not agreed to purchase, such as extended warranties and insurance polices, were included in the contract price. *These misleading representations took place at least 65 times between January 1, 1991, and February 24, 1993 * * *.*" (Emphasis supplied.)

Thus, although the Attorney General filed his action in 1993, the complaint is based on truth-in-lending violations that are alleged to have occurred during the policy period. Therefore,

---

[4] Plaintiffs argue that in *Parker v. May*, 70 Or App 715, 690 P2d 1125 (1984), *rev den* 299 P2d 31 (1985), we interpreted ORCP 23 C so as to permit a new pleading filed by a substituted party plaintiff to relate back for statute of limitations purposes to the date of filing of an original pleading. *Parker* involved the substitution of the plaintiff in a previously filed action and the effect on the statute of limitations. It did not involve the creation of multiple new actions for purposes of insurance coverage.

defendant's duty to pay defense costs under the legal damages provisions is triggered.[5] The trial court did not err in that regard.[6]

∎        In its fourth assignment of error, defendant argues that the trial court erred in granting summary judgment in favor of plaintiffs because plaintiffs failed to sustain their burden of proving they did not have other available insurance coverage. Defendant first raised this argument in its memorandum to the trial court in support of its cross-motion for summary judgment and only in regard to the contention that it was obligated to furnish coverage for the Attorney General's action. It said:

> "[P]laintiffs fail to recognize, and have failed to present any evidence, much less undisputed fact, that the additional condition of that endorsement exists, which is that 'no coverage is available to YOU under any policy in force at the time suit is filed.' "

In response, plaintiffs contended that they did not have any other insurance coverage at the time that the Attorney General filed its suit against them and that they could provide an affidavit to that effect on the request of the trial court. Plaintiffs also argued that the specific clause at issue was an "escape" clause, and as such, it was defendant's burden to prove that plaintiffs had other coverage. Defendant responded that because plaintiffs were moving for summary judgment, the burden was on them to prove that there were

---

[5] Defendant argues that the action brought by the Attorney General was not filed by or on behalf of a customer. We disagree. The complaint specifically alleged in part:

> "Pursuant to ORS 646.636, defendants should be required to provide full and complete refunds to all consumers who have purchased automobiles from any of defendants * * *. Defendants should also be required to refund consumers the cost of extended warranties, insurance policies and interest paid thereon, and order rescission of contracts entered as a result of the above deceptive practices."

[6] Generally, the claims brought by the individual plaintiffs allege conduct that occurred before the effective date of the policy. Therefore, the coverage afforded under the policy for the alleged violations that are the subject of the Attorney General's action filed after the expiration of the policy does not cover the individual claims.

no issues of fact even as to those issues that defendant would bear the burden on at trial.

The policy provision in question provides that the coverage for legal damages exists if:

"(2) AFTER THE COVERAGE PART PERIOD TO WHICH THIS ENDORSEMENT APPLIES IF YOUR ACTS GIVING RISE TO THE SUIT OCCURRED DURING THE COVERAGE PART PERIOD TO WHICH THIS ENDORSEMENT APPLIES *AND NO COVERAGE IS AVAILABLE TO YOU UNDER ANY POLICY IN FORCE AT THE TIME SUIT IS FILED.*" (Emphasis supplied.)

In the past, the Supreme Court has characterized insurance provisions similar to the one in this case as "escape" clauses. *See Sparling v. Allstate Ins. Co.*, 249 Or 471, 473, 439 P2d 616 (1968). In *Smith v. Ind. Hosp. Assn.*, 194 Or 525, 242 P2d 592 (1952), the Supreme Court explained the nature of the clause and who has the burden of proof at trial concerning its effect:

"The escape clauses, represented by the conditions of exemption and exclusion which the [insurer] has incorporated into its contract for its own protection * * * [they] are defensive in character. They cast upon the [insurer] the burden of establishing by a preponderance of satisfactory evidence that [the conditions existed]." 194 Or at 530.

■ Under ORCP 47 C, the moving party has the burden of showing that there are no genuine issues of fact and that it is entitled to judgment as a matter of law. Generally, the rule applies even as to those issues on which the nonmoving party would have the burden at trial. *See Doe v. American Red Cross*, 322 Or 502, 910 P2d 364 (1996)[7] In *Jones v. General Motors Corp.*, 139 Or App 244, 911 P2d 1243 (1996), we held that ORCP 47 C as amended by Or Laws 1995, ch 618, § 5, requires the moving party to make a *prima facie* showing that it is entitled to summary judgment. If the moving party bears the burden of persuasion at trial, it must offer evidence that would entitle it to a directed verdict at trial if

---

[7] Here, defendant's assignment of error pertains only to the granting of plaintiffs' motion for summary judgment. As the moving party on an issue on which defendant had the burden of persuasion, plaintiffs had the burden on summary judgment of offering affirmative evidence or otherwise demonstrating that defendant could not establish its defense. Plaintiffs offered no evidence about that issue or otherwise demonstrated that fact.

uncontroverted. Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party to offer evidence and demonstrate a triable issue of fact. If the burden of persuasion at trial is on the nonmoving party, the party moving for summary judgment may submit affirmative evidence that negates an essential element of the nonmoving party's claim or demonstrate that the nonmoving party's evidence is insufficient to establish an essential element of the non-moving party's claim. *Id.* at 254-55, *quoting Celotex Corp. v. Catrett*, 477 US 317, 330-31, 106 S Ct 2548, 91 L Ed 2d 265 (1986) (Brennan, J., dissenting); *see also* 477 US at 325.

Here, defendant had the ultimate burden of persuasion on whether plaintiffs had other available insurance coverage. Thus, in moving for summary judgment, plaintiffs could have demonstrated their entitlement to such relief by either: (1) submitting affirmative evidence that they had no other available coverage; or (2) demonstrating, beyond a mere conclusory assertion, that defendant's evidence was insufficient to establish the availability of other coverage. Plaintiffs did neither. Consequently, the court erred in granting summary judgment in their favor.

Defendant's final assignment of error was not preserved before the trial court, and therefore, we decline to address it.

Reversed and remanded.